UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ABBRELLA FAITH CAPPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-00519-TWP-MJD |
| | ) | |
| HOLLY CALHOUN, | ) | |
| MICHAEL PERSON Dr., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Holly Calhoun's ("Nurse Calhoun") Motion

for Summary Judgment, (Dkt. 29), and Dr. Michael Person's ("Dr. Person") Motion for Summary

Judgment, (Dkt. 31).  Plaintiff Abbrella Capps ("Ms. Capps"), a former inmate at Bartholomew

County Jail ("BCJ"), filed this *pro se* action alleging that Dr. Person and Nurse Calhoun provided

inadequate medical care during three separate periods of incarceration at BCJ. For the following

reasons, Nurse Calhoun's Motion for Summary Judgment is **granted**, and Dr. Person's Motion for

Summary Judgment is **granted in part and denied in part**.

## I.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law.  *See* Federal Rule of Civil Procedure 56(a).  Whether a party asserts that a fact

is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular

parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).

A party can also support a fact by showing that the materials cited do not establish the absence or

presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016).  "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016).  The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).   It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).  The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017).  Any

doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## II.  STATEMENT OF FACTS

The following statement of facts has been evaluated pursuant to the standards set forth above.  The facts are considered to be undisputed except to the extent that disputes are noted.

On April 13, 2020, Ms. Capps filed a response to the Defendants' Motions for Summary Judgment which consisted of a five-page handwritten document in which Ms. Capps described her disagreement with the providers' medical decisions without citing to any admissible evidence. (Dkt. 42.)  The Court agrees with the Defendants that Ms. Capps failed to comply with Local Rule 56-1(e) which requires "[a] party [to] support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  The Court will not entirely disregard her response.  While it is "well established that *pro se* litigants are not excused from compliance with procedural rules," *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008), whether the Court holds *pro se* litigants to the consequences of violating the court's Local Rules is a matter of discretion, *Gray v. Hardy*, 826 F.3d 1000, 1004-05 (7th Cir. 2016) (holding that district courts are not required to hold pro se litigants to the potential consequences of their failure to comply with the Local Rules and can instead take "a more flexible approach," including by ignoring the deficiencies in their filings and considering the evidence they submit). A flexible approach is warranted here because—given the variety and frequency of Ms. Capps' encounters with the medical providers—her statement assists the Court with narrowing the scope of her claims.  Indeed, several of her statements merely repeat the information provided by the Defendants.

A.   **Medical Care at BCJ**

Medical care at BCJ is provided by a combination of nursing staff and a contract physician. (Dkt. 29-1 at ¶ 1.)  The nurses are employed by the sheriff, and the physician is provided through a contract with Advanced Correctional Health ("ACH").  *Id.*  With respect to treatment orders, the nurses take direction from the physician and implement orders the physician issues.  *Id.*

When an inmate is booked into the jail, the inmate is asked various medical screening questions including what medications the inmate is currently taking and the pharmacy where her prescriptions are filled.  *Id.* at 2-3.  One of the nurses or a correctional officer will contact the pharmacy and attempt to verify the inmate's prescriptions including the last time the medication was refilled and the number of refills remaining.  *Id.* at 3.  The nurse will contact the physician and provide information about prescriptions reported by the inmate and verified by the pharmacy.  *Id.* The physician will either approve or deny the prescription for the inmate's use while in the  jail. *Id.*  The physician must also approve any medications the inmate had in her possession at the time of arrest or brought to the jail by friends or family  members.  *Id.*  Approved medications not supplied by the inmate are then ordered through the jail pharmacy.  *Id.*

Bartholomew County adopted policy 2004-03 establishing co-pays for inmate medical care.  (Dkt. 29-4.)  As pertinent here, the ordinance allows for a $15.00 co-pay for medical services including a physician visit, a nurse visit, or an original prescription not including refills.  (Dkt. 29-1 at 3.)  No inmate is to be refused medical care due to an inability to pay.  *Id.*  When a service is incurred, the co-pay is charged to the inmate's commissary account.  *Id*.  If there are funds in the account, the co-pay is deducted.  *Id.*  If money is deposited within 60 days of the service, the co-pay is deducted before the inmate can order commissary.  *Id.*  If there are insufficient funds to pay the co-pay after the 60 days, the charge is written off.  *Id.*

4

Inmates can purchase Tylenol from the commissary.  *Id*. The physician can also order Tylenol for an inmate through the jail pharmacy.  *Id*.

Communication between nurses and inmates is primarily through an electronic message system known as Keefe, where inmates submit medical requests or messages via a kiosk in the cellblock.  *Id*. at 4.  A nurse or jail officer responds to the message.  *Id*.  Depending on the nature of the request, the nurse will either provide information or advice, offer to see the inmate or offer to have the inmate on the list to see the physician during his weekly visit, offer to have the inmate seen by a mental health counselor or other provider, or otherwise respond as needed.  *Id*.  If the nurse examines the inmate, she will convey her findings to the physician, and the physician will advise the nurse of any orders including medications.  *Id*.  The nurse then advises the inmate of the physician's orders or that there were no new orders either via Keefe or verbally.  *Id*.  Similarly, if the nurse conveys an inmate's complaint or request to the physician, she will communicate the physician's response to the inmate.  *Id*.  Nurses cannot prescribe medication or override the physician's order.  *Id*.  Often inmates will send messages through Keefe arguing with the physician's orders with which they disagree, and the nurses often respond by reiterating the physician's order.  *Id*.

**B.    The Parties**

Nurse Calhoun is a licensed practical nurse (LPN) and has been a nurse at BCJ since May 2017.  *Id*. at 1.  Dr. Person is a licensed physician who was employed by ACH and provided medical care to inmates at BCJ in 2017 and 2018.  (Dkt. 32-1 at 1.)  Dr. Person was physically at BCJ one day a week for several hours to see patients.  *Id*.  Dr. Person also was on-call 24 hours a day, seven days a week for questions or issues regarding inmates' medical needs.  *Id*. When inmates entered BCJ, they became Dr. Person's patients, regardless of the length of time they

were to be in the jail.  *Id.* at 1-2.  Because Dr. Person became the inmates' primary care physician when they entered the jail, Dr. Person prescribed what medication and medical treatment he thought was  medically necessary and appropriate for the patient.  *Id.* at 2.  Ms. Capps has been incarcerated at BCJ and elsewhere on multiple occasions.  (Dkt. 32-3 at 17–19.)  Her lawsuit concerns three periods of incarceration at BCJ.

### 1.  <u>July–September 2017 Incarceration</u>

On July 11, 2017, Ms. Capps was arrested pursuant to a warrant and court order.  (Dkt 29-11 at 7.)  She was sentenced on September 21, 2017 to 912 days with 72 days credit and 768 days suspended and was to be held until community corrections said she could be released.

During her initial  medical  screening, Ms. Capps  indicated  that  she  was  currently taking Depakote  (Divalproex Sodium),[1] Tofranil (Imipramine), Nortriptyline (Pamelor), and Metformin which  she  had  brought  with  her  from  the  Indiana  Department  of  Correction  and  given  to  staff. (Dkt. 32-2 at 3–4.)  Dr. Person  approved  Ms. Capps'  Metformin, Depakote, and Tofranil.  (Dkt. 32-1 at 2.)  He did not approve Ms. Capps' Pamelor, as that was in the same drug class as Tofranil. *Id.*  Depakote is an anti-seizure medication that is also used to treat bipolar disorder.  *Id.*  Metformin is an oral diabetes medication.  *Id.*  Tofranil is a tricyclic antidepressant that is commonly used off-label to treat chronic pain.  *Id.*  Pamelor is a tricyclic antidepressant that is commonly used off-label  to  treat  a  variety  of  chronic  pain  complaints.  *Id.*  In  Dr. Person's  medical  opinion  and experience, there was no medical justification for a patient to be on two tricyclic antidepressants at  the same time.

When Ms. Capps was in prison, she had blood work done every 90 days, which as she

---

[1] As the medical defendants do, the Court initially refers to the medication by both their brand name and drug name. The Court then uses whichever name the parties use more frequently.  The medications most at issue in this case are Depakote, Pamelor, and Neurontin.

understood was to measure her level of Depakote and adjust the medication as needed.  (Dkt. 32-3 at 41.)  Ms. Capps asked Nurse Calhoun about getting her Depakote levels checked, and Ms. Calhoun responded that the jail did not check levels unless there was breakthrough bleeding.  *Id.*  As a policy, the jail did not check Depakote levels for inmates taking the medication as a mood stabilizer.  Ms. Capps had been on the same dosage of Depakote for approximately two years.  (Dkt. 32-3 at 43.)  Depakote levels are typically checked during the first six months of treatment, and after that patients are monitored for any symptoms of toxicity, so Dr. Person saw no need to order blood draws to check her levels.  (Dkt. 32-1 at 11.)  No medical provider has ever told Ms. Capps that she was harmed by not having her Depakote levels checked during this period of incarceration.  (Dkt. 32-3 at 46.)

Over several weeks in July, 2017, Ms. Capps sent messages inquiring about various pain medications other than Tylenol and for the provider to address pain in her sciatic nerve.  (Dkt. 29-12 at 1–2, 4–6, 10, 12.)  She requested that she be put back on Gabapentin (Neurontin), and Nurse Calhoun responded that Neurontin was not allowed at the jail.  (Dkt. 32-2 at 7.)  While Nurse Calhoun does not decide what medications are allowed, in her experience the jail doctor generally does not approve Neurontin because it is susceptible to abuse.  (Dkt. 29-1 at 5.)

Initially Ms. Capps was told she could purchase Tylenol from the commissary.  (Dkt. 29-12 at 2.)  In various messages, Ms. Capps expressed that she does not purchase things from commissary because she is indigent and that her pain is "deeper than that."  (Dkt. 29-12 at 2, 4.)  On August 17, 2017, Nurse Calhoun asked Ms. Capps if she wanted to see the doctor next  time he was in; Ms. Capps said she did.  (*Id.* at 4.)

On August 20, 2017, Ms. Capps reported for the first time that she had experienced menstrual bleeding for two weeks.  *Id.* at 4.  Nurse  Calhoun responded that the bleeding could be

7

hormone or stress related.  *Id*.  Ms. Capps saw Dr. Person on August 23, 2017.  (Dkt. 29-9 at 37.)
The treatment record noted left side sciatica and abnormal menses.  (Dkt. 29-9 at 37–38; Dkt. 29-
2 at 3.)  Ms. Capps told Dr. Person that she had no menses in June, heavy menses in July, and
sixteen straight days of vaginal bleeding with no clots.  (Dkt. 32-1 at 3.)  Dr. Person prescribed
Prednisone for the sciatic pain and told her to monitor her bleeding.  (Dkt. 29-2 at 3.)  Ms. Capps
was in her early 40s, so her complaints about her menses were neither abnormal nor concerning.
(Dkt. 32-1 at 3.)  Further, there was no medication to treat it, so Dr. Person felt the best thing to
do was monitor the issue.  *Id*.

On September 8, 2017, Nurse Calhoun informed Dr. Person that after completing her
Prednisone Ms. Capps continued to have back pain, and she still had ongoing menstrual bleeding
with cramping.  *Id*.  Dr. Person prescribed Tylenol for the pain. *Id*. Ms. Capps asked Nurse
Calhoun on September 10, 2017 to sign the medication administration record so she could have
the Tylenol. (Dkt. 29-12 at 7.)  Nurse Calhoun apologized for not having done so earlier and advised
that the matter had been taken care of.  *Id*.

Ms. Capps continued to complain of heavy menstrual bleeding. Dkt. 29-1 at 6. On
September 11, 2017, Nurse Calhoun told Ms. Capps that she spoke to the doctor and he had no
new orders.  *Id*. at 6.  On September 13, 2017, Nurse Calhoun instructed Ms. Capps to save used
tampons and pads so that she  could do a pad check to report the findings to the doctor.  *Id*.  A day
after being given a Ziplock bag, Ms. Capps provided only two tampons, one of which had two
clots.  (Dkt. 29-1 at 6-7.)  On September 15, 2017, Ms. Capps reported that her bleeding had slowed
down.  (Dkt. 29-1 at 7.)  Nurse Calhoun reported the information to Dr. Person who had no new
orders at that time.  *Id*.

Nurse Calhoun documented that on September 18, 2017, Ms. Capps had failed to return a

second bag for a pad check and had refused Tylenol during medication pass though she was continuing to report severe cramping.  (Dkt. 29-2.)

Ms. Capps saw Dr. Person again on September 20, 2017.  (Dkt. 32-2 at 39.)  During the examination she reported that she had stopped bleeding the day before and now had lower abdominal pain.  *Id.*  She reported not seeing a gynecologist in the last fifteen years.  *Id.*  As to her back pain, Ms. Capps indicated that the Prednisone had helped her back, but it caused her to be angry and that Pamelor had helped her in the past. *Id.*  Dr. Person assessed her to have dysfunctional uterine bleeding and chronic functional lower back pain.  *Id.*  By "functional," Dr. Person meant that Ms. Capps' back pain did not prohibit her from performing her activities of daily living.  (Dkt. 32-1 at 4.)  Dr. Person prescribed Pamelor for her pain and ordered that Ms. Capps be seen by a gynecologist.  *Id.*

On September 25, 2017, Ms. Capps went to a gynecologist at OB/GYN Associates of Columbus where she was diagnosed with acute pelvic pain and abnormal uterine bleeding. Dkt. 32-2 at 40. They recommended a follow-up appointment to obtain a pelvic ultrasound and prescribed Tylenol.  *Id.* at 40, 44.  Back at BCJ, Dr. Person did not modify the Tylenol order since she already had a prescription for it.  (Dkt. 32-1 at 4.)

On September 28, 2017, Ms. Capps requested that the dosage of the Pamelor be increased. (Dkt. 29-12 at 12.)  Nurse Calhoun responded that she spoke to Dr. Person and that he did not want to increase the medication.  *Id.*

Ms. Capps had her follow-up appointment at the gynecologist on September 29, 2017, where she was diagnosed with a thickened endometrium. Dkt. 32-2 at 46–47.  The gynecologist recommended another follow-up, which became Ms. Capps' responsibility since she was released from BCJ that day.  *Id.*  Ms. Capps had a follow-up appointment where she learned she should

have surgery.  However, she did not return to the gynecologist because she did not want to get another Depo-Provera shot that was recommended, and she resumed using drugs.  (Dkt. 32-3 at 56–57.)

2.      **May 2018 – September 2018 Incarceration**

On May 8, 2018, Ms. Capps returned to BCJ after being arrested for possession of methamphetamine, possession of paraphernalia, and a probation violation.  (Dkt. 32-3 at 63.)

During her medical screening Ms. Capps reported currently taking Depakote, Lexapro (Escitalopram), Neurontin, Buspirone (Buspar), and  Lasix (Furosemide). (Dkt. 32-2 at 301–02.) Lexapro is an antidepressant and also used for anxiety. Neurontin is used for a variety of conditions, primarily nerve pain.  Buspar is an anxiety medication.  Lasix is a diuretic that Ms. Capps had for a prior bout of pneumonia.  Jail staff verified the medication disclosed by Ms. Capps by calling the pharmacy that was listed on the intake form.  (Dkt. 32-1 at 4-5.)  A verification of Ms. Capps' medications showed that she did not have her Depakote filled there; she had only filled her Lasix one time; and was not actually on Lexapro.  Id. at 5. Staff did confirm that Ms. Capps had been prescribed Neurontin (Gabapentin) and Buspirone (Buspar). *Id*. Dr. Person declined to prescribe those two medications because Ms. Capps had not been prescribed them during her first period of incarceration from July 11, 2017 to September 29, 2017, and he did not recall Ms. Capps having any condition that required either medication. *Id*. Further, Dr. Person did not prescribe Buspar or Pamelor because they were duplicative of the Lexapro and Depakote. (Dkt. 32-1 at 6.)  Dr. Person believed that Ms. Capps was being over-prescribed medications by her outside providers.  *Id.*

Ms. Capps complained on May , 2018, that she needed other medications due to her severe knee pain and cartilage grinding.  (Dkt. 29-12 at 15.)  In a follow-up kiosk message, Nurse Calhoun

noted that Ms. Capps had refused a doctor's visit on May 22, 2018, and advised her that if she was not satisfied with her medical care, she needed to see him so that he could ask more in-depth questions to make a treatment plan. *Id.* at 15, 17. Ms. Capps did not want to see the doctor and incur the $15.00 charge for conditions for which she had already been diagnosed; she just wanted the medications she was prescribed outside the jail. *Id.* at 17.

On May 30, 2018, Nurse Calhoun saw Ms. Capps during a nursing visit for multiple complaints, including that she could not sleep due to her pain.[2] (Dkt. 32-2 at 325, 327.) She complained of pain and not being able to walk very well and requested to be seen by the doctor. *Id.* Ms. Capps indicated she had received Neurontin from a doctor and that an x-ray of her right knee showed arthritis. *Id.* Nurse Calhoun contacted Dr. Person regarding Ms. Capps' examination, but he did not issue any new orders. (Dkt. 32-1 at 6.) Dr. Person reviewed Ms. Capps' medical records from outside the jail, and it was his understanding that Ms. Capps had already been seen by an orthopedist at Columbus Regional Hospital for her knee pain, that she had declined a steroid injection, and had been told to use NSAIDs/Tylenol as needed and was counseled to lose weight. *Id.* Ms. Capps had refused steroid injections because she was afraid of the needle and could not sit still; she never returned to any orthopedist. (Dkt. 32-3 at 76–77, 137–38.) Dr. Person instructed Ms. Capps to use Tylenol, ice, and heat for her knee and back pain. (Dkt. 32-1 at 6.)

Ms. Capps' pain complaints continued, and on May 31, 2018 she again asked for Neurontin or another pain medication, as her pain was so bad that she could not sleep. (Dkt. 32-2 at 329.) On June 5, 2018, Dr. Person examined Ms. Capps for complaints of pain in her back and knees.

---

[2] The Court will not discuss Ms. Capps' treatment for medical issues for which she received treatment that are not part of her complaint. *See, e.g.* Dkt. 32-3 at 95–96 (Ms. Capps acknowledging she had no trouble with how a few infections were treated since her symptoms went away).

(Dkt. 32-1 at 6-7.)  Ms. Capps requested to be placed on Neurontin and also indicated she had previously been going to a pain clinic and getting Hydrocodone.  *Id*. at 7.  Dr. Person observed that Ms. Capps had pain in her left knee with palpation.  *Id*.  During the examination Dr. Person discussed with Ms. Capps the need for weight loss. *Id.* Ms. Capps had been advised by other doctors that she needed to lose weight and that her knee and back pain were related to her weight. (Dkt. 32-3 at 26.)

During the visit, Dr. Person told Ms. Capps that she could have Neurontin as long as she supplied it.  (Dkt. 32-1 at 7.)  Although Dr. Person did not think Neurontin was the best choice of medication for Ms. Capps and he did not think it was medically necessary, it was okay with him if she had a doctor on the outside willing to prescribe the medication to her. *Id.* Dr. Person's willingness to allow Ms. Capps to have Neurontin as long as she supplied it herself was based on his examination of her that day and a review of her records from her outside medical provider prior to her second incarceration that confirmed she had been prescribed Neurontin. *Id.* He also renewed her Lexapro and Depakote. *Id*.  Ms. Capps had a friend who was supposed to drop off her Neurontin, but she never did.  (Dkt. 32-3 at 82-83.)

Ms. Capps continued to submit kiosk requests and grievances throughout June 2018 complaining of pain which were responded to by nursing staff at BCJ. (Dkt. 32-2 at 343–45; 347–53.)  On June 14, 2018, Nurse Calhoun contacted Dr. Person regarding Ms. Capps' request to have her Neurontin supplied, and he again indicated that she must supply her own Neurontin, or she could buy Tylenol from the commissary.  (Dkt. 32-1 at 7.)

On June 18, 2018, Nurse Calhoun told Dr. Person that Ms. Capps had written a note to another nurse stating that she had pain down her left shoulder and down to her calf and that her left knee had not been x-rayed.  *Id.* at 8.  Dr. Person told Nurse Calhoun that he did not need to see

Ms. Capps again because he had just examined her on June 5, 2018 for her complaints of knee and back pain, and he had declined to have her left knee x-rayed at that time. *Id*. The information provided to Dr. Person did not indicate any changes in Ms. Capps' condition or any new complaints since he had last seen her.  *Id*. at 7-8.  Further, Dr. Person was aware of Ms. Capps' propensity to continue to seek pain medication even though he had already informed her that she could have Neurontin if she supplied it or could use Tylenol.  *Id*. at 8.

Ms. Capps informed the nurses through the kiosk several times in May, June, and July that no one was able to drop off the Neurontin, and this was communicated to Dr. Person.  (Dkt. 29-12 at 25, 27, 33.)  Dr. Person repeatedly responded that he would not supply Neurontin, and Ms. Capps' other option was to purchase Tylenol from commissary.  *Id.* at 28, 31.  Dr. Person would not prescribe the Tylenol.  On July 20, 2018, a nurse recommended that Ms. Capps ask other inmates if they would be willing to share their Tylenol with her since she could not afford it.  *Id.* at 34.

On August 14, 2018, Nurse Calhoun contacted Dr. Person regarding Ms. Capps' complaints of increased anxiety and having a rash.  (Dkt. 32-1 at 8.)  Dr. Person did not change any of Ms. Capps' psychotropic medication but recommended she see the jail therapist and prescribed an antifungal cream for the rash. *Id.* Ms. Capps refused the antifungal cream everyday between August 18 and August 31, 2018.  (Dkt. 32-2 at 383–98.)

On September 21, 2018, Nurse Fisher examined Ms. Capps for complaints of knee pain and left shoulder pain. (Dkt. 32-2 at 403.)  Nurse Fisher contacted Dr. Person regarding her examination and based on her assessment and Ms. Capps' subjective complaints, he did not issue any new orders.  *Id.* On September 25, 2018, Ms. Capps was released from BCJ to a residential program called WRAP in Community Corrections.  (Dkt. 32-3 at 64.

### 3.   December 2018 Incarceration

On October 30, 2018, Ms. Capps absconded from WRAP and was "on the run" until her arrest on December 11, 2018. (Dkt. 32-3 at 103-104.)  During that time, Ms. Capps resumed using illicit drugs and did not take any of her prescribed medications because she had left them at the residential facility.  *Id.* at 108.  She returned to BCJ on December 11, 2018 and during intake she could not remember all the names of her medications she was taking because she was under the influence of methamphetamines, heroin, marijuana, and unprescribed Klonopin at the time of her arrest and booking.  *Id.* at 108–109.  Jail staff contacted Genoa Pharmacy who indicated that they had last filled prescriptions for Ms. Capps for Norvasc (Amlodipine), Neurontin, Buspar, Depakote, and Pamelor on November 13, 2018.  (Dkt. 32-1 at 9.)  Norvasc (Amlodipine) is a medication used for high blood pressure.  *Id*.  Dr. Person ordered Norvasc and Depakote.  *Id*.  He did not order the Neurontin, Buspar, and Pamelor for the same reasons he had previously not approved them.  *Id*.

Ms. Capps refused her Depakote every day from December 12 through December 28, 2018. Dkt. 32-2 at 415–49.  She refused her Norvasc from December 15 through December 28, 2018. *Id.*  She refused to take the Depakote because she believed it was the wrong dosage.  *Id.* at 111–12.  Ms. Capps submitted several messages on the kiosk complaining about the charges for the medications; however, the charges were ultimately written off.  (Dkt. 29-12 at 43–49; Dkt. 29-14 at 1.)  In addition to complaining about the charges, Ms. Capps also asked to be put back on Neurontin.  (Dkt. 29-12 at 46.)  Nurse Calhoun responded via a kiosk message, "[Y]ou were only on the medications approved by the facility MD; please take prescribed medications to be compliant." (Dkt. 29-7 at 1.)  Despite being told to be "compliant," Ms. Capps was never forced to take any medications.  (Dkt. 32-3 at 114.)  Ms. Capps never saw Dr. Person in December 2018

14

and did not request to be seen by Dr. Person regarding her Depakote levels or prescription for Norvasc.  (Dkt. 32-1 at 9.)  On December 28, 2018, Dr. Person discontinued the Norvasc[3] and Depakote due to Ms. Capps' refusal to take them.  *Id.*

Dr. Person ceased being a physician at BCJ in the beginning of 2019 and had no further involvement with Ms. Capps.  *Id.*

### 4.    <u>Summary of Ms. Capps' Complaints</u>

At her deposition, Ms. Capps acknowledged that Nurse Calhoun cannot make treatment decisions.  (Dkt. 32-3 at 37, 45–46, 51, 69, 70, 80, and 129.)  Thus, when asked to identify Nurse Calhoun's conduct that supported her claims, Ms. Capps said she thought Nurse Calhoun was rude to her in person and in some of her kiosk responses.  *Id.* at 127–128.  Without evidence to support her assertion, Ms. Capps believes that Nurse Calhoun influenced Dr. Person's treatment decisions through the tone she used in communication with him, such as by saying she was "back at it" in an email to Dr. Person upon Ms. Capps' reincarceration.  *Id.* at 128.[4]

Ms. Capps alleges that Dr. Person refused to see her on multiple occasions "by him stating he didn't need to see" her.  (Dkt. 42 at 4.)  Ms. Capps also disagreed with Dr. Person's management of her medication and the treatment he provided for her irregular menses.  *Id.* at 1–5.  In large part, she disagreed with his refusal to prescribe her Neurontin or other pain medication.  Neurontin is one of several anticonvulsant medications that is used for the management of neuralgia, pain caused by damaged nerves.  (Dkt. 32-1 at 9-10.)  Dr. Person felt Neurontin was inappropriate for

---

[3] Ms. Capps states in her reply that she had not been taking Norvasc for a few months because her physician found it unnecessary. (Dkt. 42 at 4.) Because she disavowed her claim that she was compelled to take medication against her will, Dkt. 32-3 at 114, the Court need not further discuss the decision to discontinue this medication.

[4] Ms. Capps also alleges that Nurse Calhoun violated her First Amendment right by emailing Ms. Capps' sentencing judge to say Ms. Capps was threatening to file a lawsuit. The Court did not permit Ms. Capps to proceed on a First Amendment claim, and regardless Ms. Capps presented no evidence that Nurse Calhoun emailed the judge (which Nurse Calhoun denies doing) or that the alleged email had any impact on her sentencing.

Ms. Capps because Neurontin is heavily abused and trafficked in the correctional setting, Ms. Capps had a history of polysubstance abuse, and she was never diagnosed with pain related to neuralgia or seizures. *Id.* at 10. Ms. Capps complained of knee and back pain throughout her incarceration, but she never reported any changes in her symptoms. *Id.* While treating inmates at BCJ, Dr. Person based his diagnoses and treatment decisions on the inmate's subjective complaints, objective conditions, and his reasoned medical judgment. *Id.* at 11.

### III.  DISCUSSION

Ms. Capps alleges that Dr. Person and Nurse Calhoun rendered constitutionally inadequate medical care during three different time periods at BCJ.  During those times Ms. Capps was in custody for violations of her probation through community corrections but also received new charges at the time of her arrests.  This is relevant because the Seventh Circuit recently clarified that a pretrial detainee's medical care claim brought under the Fourteenth Amendment is subject only to the objective unreasonableness inquiry identified in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), rather than the deliberate indifference standard used for convicted prisoners. *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. Aug. 10, 2018).

Since *Miranda*, neither the Seventh Circuit nor district courts have decided whether an individual held on new charges and on a probation violation petition is a pretrial detainee or a convicted prisoner.  Previously, the court described this inquiry as "academic" because the same standard applied in either circumstance.  *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003).  After *Miranda*, the inquiry is no longer "academic" but remains unresolved, and, accordingly, the Defendants analyzed Ms. Capps' claims under both the Fourteenth Amendment and Eighth Amendment standards.

Under *Miranda*, the proper inquiry involves two steps.  "The first step, which focuses on the intentionality of the individual defendant's conduct, remains unchanged and 'asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case.'"  *McCann v. Ogle Cty., Ill.*, 909 F.3d 881, 886 (7th Cir. 2018) (quoting *Miranda*, 900 F.3d at 353).  In the second step, a plaintiff must demonstrate the defendant's conduct was objectively unreasonable. *Miranda*, 900 F.3d at 353.  This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable. *McCann*, 909 F.3d at 886.  "A detainee must prove more than negligence but less than subjective intent–something akin to reckless disregard." *Miranda*, 900 F.3d at 353. "Said more succinctly, [the plaintiff] must demonstrate that genuine issues of material fact exist on two questions: (1) whether [s]he suffered from an objectively serious medical condition and (2) whether the medical staff's response to it was objectively unreasonable." *Williams v. Ortiz*, 937 F.3d 936, 942–43 (7th Cir. 2019).

If, however, Ms. Capps should be treated as a convicted felon due to her status as a probation violator, her treatment and the conditions of her confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment, since prison officials have a duty to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  To prevail on an Eighth Amendment deliberate indifference medical claim, she must demonstrate two elements: (1) she suffered from an objectively serious medical condition; and (2) the defendant knew about her condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v.*

*County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).  It is a subjective rather than objective analysis, and thus is a more difficult standard to meet than a claim under the Fourteenth Amendment. *See McCann*, 909 F.3d at 886 ("A pretrial detainee 'needed only to show that the defendant's conduct was *objectively* unreasonable,' without any accompanying requirement to demonstrate, as would be the case in a claim brought under the Eighth Amendment's Cruel and Unusual Punishment Clause …, 'that the defendant was *subjectively* aware " that the medical care was unreasonable.) (quoting *Miranda*, 900 F.3d at 351).

Again, under either analysis, Ms. Capps must first show that she suffered from a serious medical condition. An objectively serious medical need is one that has been diagnosed by a physician that requires medical treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007).  Dr. Person does not dispute that Ms. Capps' conditions constituted serious medical needs, (Dkt. 37 at 28-29), while Nurse Calhoun does, (Dkt. 30 at 25).   The Court finds that—for purposes of summary judgment—Ms. Capps' medication maintenance for her mental health issues, her ongoing menstrual bleeding, and treatment for chronic pain are all objectively serious medical needs that require a doctor's attention. The Court proceeds to analyze how Nurse Calhoun and Dr. Person responded to those needs.

## A.   <u>Nurse Calhoun</u>

Ms. Capps' claims against Nurse Calhoun fail whether analyzed under the Fourteenth or Eighth Amendment because her responses to Ms. Capps were objectively reasonable.  Ms. Capps

therefore has failed to provide evidence from which a reasonable jury could find in her favor on either her Eighth Amendment or Fourteenth Amendment claims against Nurse Calhoun.

With respect to Ms. Capps' medications, Ms. Capps acknowledges that Nurse Calhoun had no ability to prescribe medication. When Ms. Capps requested Pamelor and psychiatric medications, Nurse Calhoun communicated those desires to Dr. Person and ordered the medications that he prescribed. Nurse Calhoun told Ms. Capps that the jail did not as a matter of course check Depakote levels unless there were concerning symptoms. Specifically as to Ms. Calhoun's pain treatment during her second period of incarceration, Nurse Calhoun repeatedly communicated to Dr. Person that Ms. Capps wanted Neurontin but that no one was bringing it to the jail on her behalf.  Nurse Calhoun also told Dr. Person that Ms. Capps could not afford Tylenol from the commissary. Regarding her menstrual bleeding, Nurse Calhoun conveyed Ms. Capps' concerns to Dr. Person and directed Ms. Capps to collect her pads and tampons so that Nurse Calhoun could monitor the bleeding and check for blood clots.  Nurse Calhoun reported her findings based on the items Ms. Capps provided.

During Ms. Capps' last period of incarceration, Ms. Capps refused to take the medicine prescribed to her because she thought it was the wrong dosage. Nurse Calhoun had verified Ms. Capps' medications and dosages from her local pharmacy and reported the verified medication to Dr. Person, who approved Norvasc and Depakote. Although Ms. Capps took issue with Nurse Calhoun's comment that she should take her prescriptions to be "compliant," it was not objectively unreasonable for Nurse Calhoun to advise Ms. Capps to take the medications prescribed to her that she was refusing.

Ms. Capps alleges that Nurse Calhoun influenced Dr. Person's treatment decisions through her rude tone in some messages to Dr. Person.  But there is no evidence that she provided false or

19

misleading information which adversely affected Dr. Person's medical decisions. Rather, the emails and kiosk messages demonstrate that Nurse Calhoun consistently communicated Ms. Capps' symptoms for all her medical complaints to Dr. Person and followed through with whatever Dr. Person ordered. A nurse who follows the physician's orders—especially where nothing about the physician's orders raise any obvious risks—does not act objectively unreasonably. *McCann*, 909 F.3d at 887 (holding jail nurse who administered a fatal dose of methadone to an inmate in accordance with the physician's prescription did not act objectively unreasonably).

Because no reasonable factfinder could find that Nurse Calhoun acted objectively unreasonably (and accordingly, none could find that she acted with deliberate indifference), Nurse Calhoun is entitled to summary judgment.

**B.**     **Dr. Person**

No reasonable jury could find that Dr. Person's treatment decisions during Ms. Capps' first and third periods of incarceration were objectively unreasonable, and Dr. Person is therefore entitled to summary judgment on Ms. Capps' claims regarding those time periods.  However, there is a material question of fact regarding Dr. Person's treatment of Ms. Capps' pain during the second period of incarceration.

**1.**     **July – September 2017 Incarceration and December 2018 Incarceration**

Dr. Person's medical decisions during Ms. Capps' first and third periods of incarceration were reasonable.

Ms. Capps' had five prescriptions from when she was incarcerated in prison that she sought to transfer to BCJ. Dr. Person continued Ms. Capps' prescriptions for three medications—Depakote, Tofranil, and Metformin. He did not approve Pamelor because it was a tricyclic

antidepressant like Tofranil and therefore unnecessary in his opinion.  Although Ms. Capps' prior medical provider at the prison had prescribed both, differences in medical opinion between Dr. Person and her previous provider do not render his choice to discontinue the medication unreasonable. "Disagreement between a prisoner and [her] doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish [deliberate indifference]." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).  *See also Williams*, at 944 (fact that staff did not prescribe desired pain medication or provide mattress to inmate did not mean the course of treatment was objectively unreasonable). Further, when Ms. Capps continued to experience chronic back pain, Dr. Person prescribed her Pamelor because she told him it had been more effective than the Prednisone he provided.

Dr. Person's decision not to test Ms. Capps' Depakote levels was also reasonable because she had been on the same dosage for two years and exhibited no signs of toxicity.  Further, none of Ms. Capps' other medical providers ever told her that she suffered any adverse effect from not having the levels checked.

Dr. Person also rendered reasonable treatment for Ms. Capps' menstrual issues.  He told Ms. Capps that at her age, irregular menstrual bleeding was not abnormal, and she should monitor it. At times she reported that the bleeding had slowed down, making his recommendation to monitor it reasonable. When she continued to have irregular bleeding, he referred her to a gynecologist. The gynecologist recommended further treatment, but Ms. Capps was no longer incarcerated and never followed up with the recommended surgery.

As for the final period of incarceration, Ms. Capps disagreed with the dosage of her Depakote, but she never requested an appointment to see Dr. Person about the dosage.  Instead,

she refused to take her medication, and it was therefore reasonable for Dr. Person to discontinue the medication due to her noncompliance.

Because no reasonable factfinder could find that, under the totality of circumstances, Dr. Person's medical decisions were objectively unreasonable (and accordingly, none could find that he acted with deliberate indifference), Dr. Person is entitled to summary judgment on all claims for the first and third periods of incarceration.

### 2.    May – September 2018

There is a material issue of fact as to whether Dr. Person's treatment decisions regarding Ms. Capps' complaints of pain during her second time at BCJ were constitutionally sound.  As Dr. Person attested, all inmates incarcerated at BCJ became his patients.  Thus, if he was concerned that Neurontin was an unsafe medication for Ms. Capps given her addiction history and its potential lack of efficacy for her complaints, it is odd that he would allow her to take it so long as she supplied it from an outside source.  But the real problem is that Dr. Person provided Ms. Capps with *no* pain medication, not that he failed to provide her with the medication of her choice.

Dr. Person observed that Ms. Capps was experiencing pain when he examined her on June 5, 2018.  Consistent with her outside orthopedist, Dr. Person advised her to lose weight and take Tylenol for her arthritic pain.  This recommendation could be considered reasonable.  But the nurses repeatedly told Dr. Person over the next several months that no one was bringing Ms. Capps her Neurontin and that she could not afford to purchase Tylenol from commissary.  And while weight loss would no doubt help Ms. Capps in the long term, people do not lose weight overnight. The fact that one of the nurses counseled Ms. Capps to try to obtain Tylenol from other inmates is particularly concerning.  In *Williams*, relied upon by Dr. Person, the Seventh Circuit held that the doctor's decision to deny the inmate his desired prescription pain medicine was not objectively

unreasonable.  937 F.3d at 944.  But that was in light of the fact that the doctor had prescribed other pain medication and issued a knee support brace and a bandage wrap to alleviate joint pain. *Id.* at 943.  A reasonable jury might find that Dr. Person's decision not to prescribe her any pain medication when he knew she was experiencing pain and that she could not afford to buy the medication from commissary was objectively unreasonable.

There is also a question of fact as to whether Dr. Person was deliberately indifferent under the more stringent Eighth Amendment deliberate indifference analysis.  For a medical practitioner, deliberate indifference can be shown by a "treatment decision that is 'so far afield of accepted professional standards' that a jury could find it was not the product of medical judgment." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)).  The Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances."  *Pyles*, 771 F.3d at 409.

However, a plaintiff may be able to "establish a departure from minimally competent medical judgment where a prison official persists in a court of treatment known to be ineffective." *Petties v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016).  And "[i]f a prison doctor chooses an easier and less efficacious treatment without exercising professional judgment, such a decision can also constitute deliberate indifference."  *Id.* (internal citations and quotations omitted).

Dr. Person argues that Ms. Capps' claim fails because Ms. Capps wanted a specific medication, Neurontin, and prisoners are not entitled to demand specific treatment. (Dkt. 37 at 32 (string citation omitted).)  Although Ms. Capps repeatedly asked for Neurontin, she also asked for Dr. Person to consider other pain medications or, at minimum, to prescribe her Tylenol because she could not afford to purchase it on commissary.  A factfinder could conclude that Dr. Person

did not exercise professional judgment when he refused to prescribe Ms. Capps Tylenol on account of her inability to purchase it from commissary, or evaluate her to see if another pain medication would be effective and safe to treat her pain. After all, he previously prescribed her Tylenol, Prednisone, and Pamelor during her first period of incarceration to treat her various complaints of pain.

Notably, Dr. Person does not acknowledge that Ms. Capps lacked access to Tylenol during this timeframe. He states, "[T]he Seventh Circuit already has held that a medical provider can use his own medical judgment to determine that a non-narcotic pain medication is appropriate without violating someone's Constitutional rights." (Dkt. 37 at 32-33) (citing *Holloway v. Delaware County Sheriff*, 700 F. 3d 1063, 1074 (7th Cir. 2012)). This argument simply ignores the evidence showing Dr. Person repeatedly denied prescribing Tylenol for Ms. Capps.

Relatedly, Dr. Person's refusal to see Ms. Capps in mid-June could be viewed as unreasonable and deliberately indifferent. At the June 5, 2018 appointment, Dr. Person told Ms. Capps she could take Neurontin if she supplied it or Tylenol purchased from commissary. When she could not obtain either medication, she requested another appointment, noting her left knee was not x-rayed and also citing pain that ran down her left shoulder into her calf. Dr. Person concluded the appointment was unnecessary because Ms. Capps' complaints were generally the same as during the June 5, 2018 visit and he had informed her that she could use Neurontin or Tylenol. But the nurses told Ms. Capps that adjustments of medication generally required a consultation with the physician, and Dr. Person was told that Ms. Capps was not able to obtain either medication after the June 5, 2018 appointment.

Accordingly, a reasonable factfinder could conclude that Dr. Person was deliberately indifferent to Ms. Capps' complaints of pain. Summary judgment is therefore **denied** for her pain-

related claims, whether analyzed under the Eighth or Fourteenth Amendment, for the second period of incarceration.

## IV.  CONCLUSION

For the foregoing reasons, Defendant Holly Calhoun's Motion for Summary Judgment, (Dkt. [29]), is **GRANTED**.  Defendant Dr. Person's Motion for Summary Judgment, (Dkt. [31]), is **DENIED** as to Ms. Capps' pain-related claims for the second period of incarceration, but **GRANTED** as to his treatment of her during the first and third periods of incarceration.  The pain-related claims against Dr. Person shall proceed to settlement or trial if one is necessary.

The Court prefers that Ms. Capps be represented by counsel at a settlement conference. The Court has prepared a form motion to be used by indigent litigants seeking the appointment of counsel.  The form requests the information necessary for the Court to determine the merits of the motion, and it requires the litigant to acknowledge important conditions of the appointment of counsel.  Ms. Capps shall have **through September 4, 2020**, by which to either return a completed motion for counsel form to the Court or object to the recruitment of counsel on her behalf.  **The Clerk is directed** to include a copy of the motion for counsel form with Ms. Capps' copy of this Order.

**SO ORDERED.**

Date:  8/21/2020

_Tanya Walton Pratt_
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Abbrella Faith Capps, #168857
PLAINFIELD CORRECTIONAL FACILITY
Inmate Mail/Parcels
727 Moon Road
Plainfield, Indiana  46168

25

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com

Carol A. Dillon
BLEEKE DILLON CRANDALL PC
carol@bleekedilloncrandall.com

Jill Esenwein
BLEEKE DILLON CRANDALL PC
jill@bleekdilloncrandall.com